CASSANDRA WASHINGTON on her own
behalf, and on behalf of LOCAL SCHOOL
COUNCIL FOR STEPHEN F. GALE
COMMUNITY ACADEMY,

        Plaintiff,

        v.

BOARD OF EDUCATION OF THE CITY OF
CHICAGO,

        Defendant.

No. 17 CV 2343

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiff, Cassandra Washington, and defendant, Board of Education of the City of Chicago, executed a settlement agreement and release of claims arising out of her employment. Washington brings this lawsuit seeking a declaration that the agreement is unenforceable under federal and state law; a declaration that she is entitled to leave under the Family and Medical Leave Act; a declaration that federal law preempts the Illinois statute on which defendant based her termination; a state-law writ of certiorari; and damages for defendant's fraudulent inducement and fraudulent concealment. Defendant moves to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, the motion is granted.

## I.    Legal Standards

A Rule 12(b)(1) motion challenges jurisdiction in federal court; on such a motion, the plaintiff bears the burden of establishing the elements necessary for

jurisdiction. *Scanlan v. Eisenberg*, 669 F.3d 838, 841–42 (7th Cir. 2012). With a 12(b)(1) motion, a court may look beyond the complaint's allegations and consider any evidence that has been submitted on the issue of jurisdiction. *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). By contrast, a Rule 12(b)(6) motion "tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). The complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). A court may consider allegations in the complaint and documents attached to the complaint.[1] *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). When analyzing a motion under Rule 12(b)(1) or Rule 12(b)(6), the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Scanlan*, 669 F.3d at 841. The court need not accept legal conclusions or conclusory allegations, however. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). The board invoked Rule 12(b)(1), but its motion does not substantively dispute this court's power to hear the dispute. Its motion is, essentially, a Rule 12(b)(6) motion arguing that Washington has not stated a claim for relief.

## II.  Background

Washington is a certified and licensed school administrator and teacher in the State of Illinois; she is African-American, and she is over forty-years old. [21]

---

[1] Since Washington attached the settlement agreement as an exhibit to her complaint, *see* [21] at 23–27, I may accept the terms contained therein as facts in my analysis. Fed. R. Civ. P. 10(c); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss."). Bracketed numbers refer to entries on the district court docket.

¶¶ 7–8, 16. She began working for Chicago Public Schools in 1992. *Id.* ¶ 15. Since that time, she has worked as a teacher, assistant principal, and contract principal. *Id.* In February 2014, Washington signed a contract to serve as the principal at Stephen F. Gale Community Academy. *Id.* ¶ 17. As a result of those contract negotiations, Washington says that a special and confidential relationship developed between her and Chicago Board of Education's law department. *Id.* ¶ 55. Under the principal contract, the board was obligated to pay Washington an annual salary and certain benefits from July 1, 2014 through June 30, 2018. *Id.* ¶¶ 17–18. Washington says that the principal contract could only be terminated after a full due process hearing or after a knowing and voluntary agreement of all of the parties, including the Local School Council for Gale. *Id.* ¶ 19.

Yet, the board had an unwritten policy through which it "systematically targeted experienced African-American female contract principals who were more than forty years of age for unjustified removal and dismissal from employment before the terms of their contracts expired" in order to replace those contract principals with "politically connected, younger and cheaper candidates who were unlikely to exercise their first amendment rights." *Id.* ¶ 25. In furtherance of this policy, the board would threaten to terminate these principals under 105 ILCS 5/34-8.3 and threaten to make disparaging remarks about the principals' professionalism. *Id.* During the 2015 to 2016 school year, the board used this unwritten policy to target Washington.[2] *Id.* ¶ 26. Specifically, Washington says that

---

[2] Washington says that the board did not target contract principals who were similarly-situated to her, but who were not African-American females over forty-years old. [21] ¶ 26.

CPS pressured her supervisor, Philip Salemi, to remove her from her position as the principal at Gale. *Id.* ¶ 28. On May 10, 2016, Salemi issued Washington a Corrective Action Plan, the terms of which Washington viewed as unreasonable and unrealistic. *Id.* ¶ 29. Washington says the CAP was not based on facts and that the Human Resources Department did not approve it, as is required by CPS policy. *Id.* ¶ 30.

In July 2016, an attorney in the board's law department, James Ciesil, contacted Washington through her union and demanded that she resign immediately from her position as principal at Gale or else, face involuntary termination. *Id.* ¶ 34. The board also issued a public warning resolution against Washington, falsely accusing her of exhibiting conduct that is unbecoming of a principal. *Id.* ¶ 35. Shortly thereafter, the board drafted the "Settlement Agreement and General Release" and presented it to Washington for her signature. *Id.* ¶ 38; *see also id.* at 23–27. Washington believes that the board did so because it wanted to manipulate her into agreeing to leave her position, and also, because it wanted to retaliate against her for exercising her first amendment rights at a rally.[3] *Id.* ¶ 37.

On August 20, 2016, Washington signed the settlement agreement. *Id.* ¶ 3; *see also id.* at 27. The settlement agreement's recitals provide: (1) Washington is employed as principal at Gale; (2) Washington and the Chicago Board of Education

_____

[3] On May 25, 2016, Washington attended and spoke at a rally to oppose inequitable funding for public schools. *Id.* ¶ 32. Washington says that CPS was aware that she participated in the rally because it was widely reported in the local media. *Id.* Washington further protested the inequitable funding for public schools by symbolically rejecting the budget that CPS allocated to Gale for the 2016 to 2017 school year. *Id.* ¶ 33.

are parties to the 2014 employment contract; (3) the board seeks to end the 2014 contract before its end date; (4) Washington did not successfully complete her CAP, she has been removed from her principal position at Gale, and she has been reassigned to a "Central Office position"; (5) Washington denies that she should have received the CAP or that she did not successfully complete the CAP; and (6) the board and Washington seek to resolve "any and all issues between them." *Id.* at 23.

The section titled "Board's Consideration to Washington" outlines the following: the board will not conduct a contested § 8.3 hearing, which could lead to the forced removal of Washington from her principal position with no consideration. *Id.* The board will not place Washington in a negative light during any § 8.3 principal removal proceedings. *Id.* Washington will work in an administrative position with no break in service from August 9, 2016 through December 9, 2016, and she will continue to receive the same pay and benefits that she received as the principal of Gale. *Id.* at 24. On December 12, 2016, the board will place Washington into an approved unpaid leave position through June 30, 2017. *Id.* During this time period, Washington will be entitled to use any and all of her accrued sick days, personal days, and the like; additionally, the board will continue to make pension contributions for Washington, and she will be entitled to receive her same benefits. *Id.* The board agrees to remove the CAP and any related documents from Washington's personnel file. *Id.* The board also agrees to not contest any unemployment compensation claim that Washington may file after June 30, 2017.

*Id.* The board agrees that Washington will be eligible for rehire in any position for which she qualifies after June 30, 2017. *Id.* Finally, the board will allow Washington to send a letter to the Gale community, which has been agreed to by the parties. *Id.*

The section titled "Washington's Consideration" provides that Washington consents to: (1) release all claims or causes of action which she has or may have against the board arising out of or in connection with her employment and her separation from employment with the board,[4] (2) her removal as principal of Gale under 105 ILCS 5/34-8.3, which results in the termination of her principal contract on October 31, 2016, and (3) submitting her written retirement from the board with an effective date of June 30, 2017, which will be final and binding, and which may not be rescinded. *Id.* at 24–25.

The agreement expressly states that Washington was afforded the opportunity to receive the advice and assistance of counsel of her choice; that she had the opportunity to discuss the terms of the agreement with counsel of her choice; and that the board has not interfered with that opportunity in any way. *Id.* at 25. Relatedly, the agreement makes clear that Washington's release of claims includes any claims she has against the board under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 *et seq.* [21] at 25. To that end, the agreement states that the board tendered the agreement to Washington's

---

[4] Specifically, the agreement forbids Washington from bringing "any claims for reinstatement, past or future wages or salary, past or future employment benefits of any kind, compensatory or punitive damages, attorneys' fees, costs and/or expenses" under local, state, or federal statutes or common law. *Id.* at 25.

representative on August 10, 2016, and afforded her representative twenty-one calendar days to consider signing the agreement. *Id.* The agreement also provided that Washington may revoke the agreement up to seven days after she executed it, if she hand-delivered a letter to the board's counsel; but if Washington did not revoke by 5:00 p.m. on the seventh day, the agreement provided that it would go into effect at 5:01 p.m. on that seventh day. *Id.* at 25–26.

Notwithstanding these express terms contained in the settlement agreement, Washington alleges that her agreement was invalid, and she says that she would not have signed the agreement if she had known that: (1) the board's hearing procedures did not allow for cross-examination of witnesses; (2) the board intended to hold actual hearings[5]; or (3) the board did not intend to comply with its salary and benefit obligations to her under the principal contract.[6] *Id.* ¶ 40.

## III. Analysis

### A. Jurisdiction

District courts have original jurisdiction over all civil actions arising under the "Constitution, laws, or treaties" of the United States. 28 U.S.C. § 1331. The

---

[5] In October 2016 and December 2016, the board held hearings, purportedly to consider terminating Washington's contract, and on December 7, 2016, the board claimed in a public document that Washington "waived her right to a hearing regarding her removal as Principal." *Id.* ¶ 44.

[6] In November 2016, the board awarded pay increases to all principals effective September 2016; but, the board informed Washington that she was ineligible; thereby depriving her of her earned salary and earned retirement benefits (which are tied to her base salary). *Id.* ¶¶ 45–46. Washington says that the board also deprived her of unpaid, job-protected FMLA leave by failing to act on her request for such leave from June 28, 2017 until July 17, 2017. *Id.* ¶¶ 47–48. Finally, Washington says that she has asked to be reassigned to another school or position, but that the board has failed to respond; and that Washington has applied for employment for which she is qualified at various CPS schools, but that she has not been considered for any of these positions. *Id.* ¶¶ 49–50.

complaint states that this court has subject-matter jurisdiction over this case because Washington "raises federal claims" under the Declaratory Judgment Act, 28 U.S.C. § 2201, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.*, the Family and Medical Leave Act, 29 U.S.C. § 2601 *et. seq.*, the Civil Rights Act of 1964, 42 U.S.C. § 1983, the First and Fourteenth Amendments of the United States Constitution, as well as the Supremacy Clause of the United States Constitution. [21] ¶ 1. The board does not challenge this jurisdictional statement, but I have an independent duty to determine whether jurisdiction is lacking. Fed. R. Civ. P. 12(h)(3); *Yasuda Fire & Marine Ins. Co. of Europe, Ltd v. Continental Cas. Co.*, 37 F.3d 345, 347 (7th Cir. 1994). Neither the Declaratory Judgment Act, 28 U.S.C. § 2201, nor the Supremacy Clause may serve as an independent basis for federal jurisdiction. *TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 634 (7th Cir. 2003); *New West, L.P. v. City of Joliet*, 491 F.3d 717, 719 (7th Cir. 2007). Although the complaint cites § 1983 and the First and Fourteenth Amendments, no claim asserted in the pleading arises under § 1983. Nevertheless, the complaint seeks a declaration of Washington's rights under other federal statutes (which provide for private rights of action), namely the ADEA and the FMLA, and so I conclude that there is subject-matter jurisdiction over this dispute.

### B.    Validity and Enforceability

The outcome of this motion to dismiss depends in large part on determining whether the settlement agreement is valid and enforceable. A settlement agreement is a contract, and it is governed by principles of state contract law. *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (citing *Cushing v. Greyhound Lines, Inc.*, 2013

IL App (1st) 103197, ¶ 354). A release within a settlement agreement is also governed by contract law. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill.2d 440, 447 (1991). When an agreement is clear and explicit, a court must enforce it as written; "[b]oth the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids." *Rakowski v. Lucente*, 104 Ill.2d 317, 323 (1984). A contract that may be understood in more than one way is not clear or explicit. *Whitlock*, 144 Ill.2d at 444.

Washington does not assert that the settlement agreement is unclear or that it is open to more than one interpretation (my own reading confirms that there is no ambiguity); instead, she advances several theories as to why the settlement agreement may not be enforced. An unambiguous agreement may be avoided if it was obtained through fraud, duress, illegality, or mistake. *Simmons v. Blauw*, 263 Ill.App.3d 829, 832 (1st Dist. 1994) (citing *Frank Rosenberg, Inc. v. Carson Pirie Scott & Co.*, 28 Ill.2d 573, 579 (1963).[7]

### 1. *Fraud*

Washington argues that the agreement is unenforceable because it was procured by the board's fraudulent inducement and fraudulent concealment. In order to establish either fraudulent inducement or fraudulent concealment,

---

[7] Ordinarily, a defendant's claim that a plaintiff's case is defeated by a settlement agreement and release is an affirmative defense that need not be anticipated by the complaint. *See ADM Alliance Nutrition, Inc. v. SGA Pharm Lab, Inc.*, 877 F.3d 742, 745 (7th Cir. 2017). But courts can resolve such defenses where the pleadings and arguments make plain the scope and enforceability of the release. *See id.* 745–46. That is true here, and Washington has fully addressed the merits and she does not object to addressing the board's arguments under the auspices of a 12(b)(6) motion.

Washington must show that the board made a representation of material fact, which it knew was false, for the purpose of inducing her to act, and that Washington reasonably relied upon the representation to her detriment. *Lewis v. School Dist. #70*, 648 F.3d 484, 487 (7th Cir. 2011) (citing *Jordan v. Knafel*, 378 Ill.App.3d 219, 228 (1st Dist. 2007)); *Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1207 (7th Cir. 1998) (citing *National Republic Bank of Chicago v. National Homes Const. Corp.*, 63 Ill.App.3d 920, 924 (1st Dist. 1978)). Additionally, to show fraudulent concealment, Washington would also need to allege that the board intentionally omitted or concealed a material fact that it was under a duty to disclose to her. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012) (citing *Weidner v. Karlin*, 402 Ill.App.3d 1084, 1087 (3d Dist. 2010)).

According to Washington, the agreement contained the following misrepresentations: (1) the board intentionally omitted that Washington has a right to a due process hearing before she can be removed from her principal position and that the board intended to conduct one or more private hearings after she signed the agreement; (2) the board intentionally failed to disclose to Washington that it intended to use her agreement as a waiver of her due process rights; (3) the board intentionally omitted that the § 8.3(d) hearing does not allow for confrontation and cross-examination of witnesses; (4) the board intentionally misrepresented that Washington would continue to receive the salary and benefits she was guaranteed under her principal contract; (5) the board intentionally misrepresented that the § 8.3(d) hearing procedures provide for "uncontested" hearings; and (6) the board

intentionally misrepresented that the removal term under 105 ILCS 5/34-8.3 was intended to result in contract termination. [21] ¶ 38. Washington says it was reasonable for her to rely on these misrepresentations because the board had documents with "special and material facts" about its hearing procedures, which were unavailable to Washington. *Id.* ¶ 39. She also says that her previous dealings with the board's law department, including the negotiation of her principal contract, caused her to repose trust and confidence in them. *Id.* ¶ 55. Her reliance was detrimental, Washington says, because it deprived her of an opportunity to make a voluntary and knowing decision.

Washington offers an additional theory to support her fraud argument—she says that when Ciesil told her union representative that Washington would be subjected to a public hearing and termination if she did not resign immediately, Ciesil knew that his statement was false because the board never intended to hold a public hearing over Washington's termination. *Id.* ¶ 84. Washington says that her reliance on that statement caused her to sign the settlement agreement, and that doing so caused her to lose wages and retirement benefits, and to suffer damage to her professional reputation, among other issues. *Id.* ¶¶ 86, 95.

The board argues that Washington cannot establish the required elements for either fraudulent inducement or fraudulent concealment because she cannot show that her reliance was reasonable.[8] *See National Republic*, 63 Ill.App.3d at 924–25. It

---

[8] The board moves to dismiss plaintiff's fraud claim for failure to comply with Federal Rule of Civil Procedure 9(b), which requires a party who alleges fraud or mistake to state "with particularity" the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). This rule is commonly understood as requiring the "who, what, when, where, and how of the

would not be reasonable, the board asserts, for Washington to rely on the board's law department because Washington was represented by her own attorney and because the board's law department represented her adversary, as evidenced by the fact that they were trying to terminate her. *See* [21] ¶¶ 34, 35, 37, 84, 86, 90, 91. The board also points to the express language of the settlement agreement as proof that Washington indeed relied on her own counsel and not on the board's counsel in signing the settlement agreement. In relevant part, the agreement states: "Washington acknowledges that she has had the opportunity to discuss the terms of this Agreement with counsel of her choice and that the Board has not interfered with that opportunity in any way." [21] at 25.

With respect to Washington's assertions of concealment, the board notes the absence of any duty to disclose information to Washington. A duty of disclosure would exist if the board and Washington were in a fiduciary relationship, and it may arise if Washington placed trust and confidence in the board, such that the board had influence and superiority over her. *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 500 (1996). Washington does not allege that a fiduciary relationship exists between her and the board; and although fiduciary duties are imposed on the attorney-client relationship, it is clear from the complaint that the attorneys in the board's law department were the board's attorneys. Washington does not allege that

---

fraud." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011). Here, the complaint provides the requisite details. *See* [21] ¶¶ 84–85 (a law department employee, probably Ciesil, made knowingly false statements in a conversation with Washington's representative). These allegations describe Washington's theory of the fraud with sufficient specificity under Rule 9(b).

any of those attorneys were her personal attorneys. Instead, Washington attempts to argue that by virtue of the relationship she developed with the board's law department through her principal contract negotiations, those attorneys owed her a duty. [25] at 9 (citing *Burdett v. Miller*, 957 F.2d 1375, 1381–82 (7th Cir. 1992)).

*Burdett* does not support Washington's point. In *Burdett*, the Seventh Circuit examined the relationship that developed over a period of years between an investor and her financial advisor, and it concluded that the advisor owed the investor a fiduciary duty because the advisor "cultivated a relationship of trust" with the investor, held himself out as an expert in a field in which he knew the investor was inexperienced, and he gave the investor advice, knowing that she accepted the advice unquestioningly and without a second opinion. *Id.* at 1381. The court clarified that the advisor "could have protected himself from being deemed a fiduciary" if he had explained the circumstances of the investments, disclosed his stake in the investments, or advised the investor to seek additional counsel before acting. *Id.* From the face of the settlement agreement, it is clear that Washington had the benefit of being represented by independent counsel and that the board explained its interest in the execution of the settlement agreement; thus, *Burdett* is distinguishable from this case. Washington cites no other authority to support her theory that the board's law department owed her a duty of disclosure.

The complaint's bare assertion that the board "gained an influence and superiority" over Washington is not supported elsewhere in the record; rather, the terms of the settlement agreement directly contradict such an assertion. [21] ¶ 55.

The agreement expressly states that Washington was represented by her own independent counsel of choosing; that the board did not interfere with that opportunity; and that she had twenty-one days to consider whether to sign the agreement and seven days to revoke her agreement. [21] at 25–26. Washington does not cite any authority to support the idea that the board could have influence and superiority over her, even though she was properly represented by independent counsel and she had adequate time to reflect on the terms of the agreement before it became enforceable. To the contrary, courts typically presume that plaintiffs who are represented by counsel in negotiations have made an effective waiver. *Pierce v. Atchison, Topeka and Santa Fe Ry. Co.*, 65 F.3d 562, 570–71 (7th Cir. 1995). Nothing in the record indicates otherwise here. The complaint fails to allege that the settlement agreement was procured by fraud.

### 2.   *Duress*

Washington argues that she signed the agreement under duress because the board had threatened to terminate her employment and subject her to a humiliating public hearing. [25] at 11. To establish duress, Washington must show that the board's wrongful act left her "bereft of the quality of mind essential to the making of a contract." *Alexander v. Standard Oil Co.*, 97 Ill.App.3d 809, 815 (5th Dist. 1981). Yet, a plaintiff cannot establish economic duress when her "consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances." *Id.*

The board argues that Washington cannot establish duress because she had alternatives to signing the agreement and she had sufficient time to consider such

alternatives. Washington's alternative to signing the agreement would have been to defended her school's progress towards the CAP at the § 8.3(d) hearing. That Washington may have perceived the § 8.3(d) hearing as a threat because statements made at the hearing may embarrass her does not rise to the level of duress, the board asserts. "Duress is not shown by the fact that one was subjected to mere annoyance, vexation, [or] personal embarrassment." *Herget Nat. Bank of Pekin v. Theede*, 181 Ill.App.3d 1053, 1057 (3d Dist. 1989).

Moreover, if Washington had chosen to pursue the § 8.3(d) hearing, she could have contested her removal while still receiving her full principal salary. As the board points out, this negates any showing of economic duress. *See Pierce*, 65 F.3d at 569. Furthermore, Washington signed the agreement after consulting her independent counsel of choice, and the agreement only went into effect at the conclusion of the seven-day waiting period, where Washington opted to not revoke her agreement. A plaintiff rarely succeeds in attempting to claim that her will was overborne by economic duress when they had time for "inquiry, examination, and reflection." *Alexander*, 97 Ill.App.3d at 816. This case is no exception. Washington has failed to allege that she was under duress when she signed the settlement agreement.

### 3.   *Illegality*

Under Illinois law, a contract that is "expressly prohibited" by a valid statute is void. *De Kam v. City of Streator*, 316 Ill. 123, 129 (1925). Washington has three bases for arguing that the agreement is illegal. First, she argues that the agreement is illegal because the board's general counsel signed the agreement, but "the Board"

did not approve it, as is required by § 3.2 of the Rules of the Board of Education of the City of Chicago. [25] at 3; [25-1]. Section 3.2 provides that the general counsel has authority to settle lawsuits "for a sum up to and including $50,000" without the board's approval.[9] [25-1] at 3. According to Washington's calculations, the board would have to pay her a minimum of $56,173.33 under the agreement, which would bring the agreement beyond the scope of the general counsel's authority.[10] [25] at 4. The board argues that § 3.2 only applies when an agreement includes a monetary award. Since the board merely agreed to reassign Washington and to continue providing her the same salary and benefits, the settlement agreement did not include a monetary award. "Reassignment of an employee from one position within the Board to another and paying her for the job performed does not require Board approval." [31] at 7 n.2.

Neither party cites any authority to support their interpretations of § 3.2. In light of my obligation to apply a strict test and to favor a construction that would render the contract enforceable rather than void, *Swavely v. Freeway Ford Truck Sales, Inc.*, 298 Ill.App.3d 969, 976 (1st Dist. 1998), I conclude that the settlement agreement is not "expressly prohibited" by § 3.2 because the agreement does not refer to any sum of money, let alone one that exceeds $50,000.

---

[9] Washington notes that rules that the board lawfully adopts pursuant to statutory authority have the force of law and they govern the board's actions. *Sullivan v. Hannon*, 58 Ill.App.3d 572, 574 (1st Dist. 1978).

[10] Given Washington's annual salary of $168,520.00, and the board's agreement to reassign Washington to an administrative position for four months at her principal salary, Washington concludes that four months' worth of her annual salary equals $56,173.33. [25] at 4.

Another reason the agreement is illegal, according to Washington, is that it purports to waive wage claim rights, which is contrary to public policy. [25] at 8 (citing *Lewis v. Giordano's Enterprises, Inc.*, 397 Ill.App.3d 581, 597 (1st Dist. 2009)). Although the board does not address this issue, I note that the statutes involved in *Lewis* concern an employer's failure to pay minimum wages and an employer's wrongful withholding of employee benefits, which are not at issue here. Since Washington did not waive such rights by signing the settlement agreement, the agreement does not run afoul of *Lewis*, 820 ILCS 105/2, or 820 ILCS 115/9.

Third, Washington argues that the agreement is illegal because the release covers claims that may arise in the future. [25] at 2 (citing *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 286 (2003)). As the board notes, however, the release does not cover *all* claims that could arise between Washington and the board. The release has a limited scope—it expressly states that Washington releases her right to pursue relief for claims relating to her employment or separation from the board. I agree with the board; the settlement agreement contains an appropriately limited release and is not illegal. *Cannon*, 752 F.3d at 1092 (citing *Rakowski*, 104 Ill.2d at 323).

4. *Mistake*

Washington also argues that the agreement is unenforceable because it is based on a mutual mistake. A contract can be voided if at the time of formation, both parties were mistaken about a basic assumption on which the contract was made, and the mistake had a material effect on the exchange of performances. *Billhartz v. C.I.R.*, 794 F.3d 794, 799 (7th Cir. 2015). Washington says that at the time of contract formation, she and the board both mistakenly believed that the

agreement did not require the board's approval. The board did not respond to this argument; but, its general arguments concerning illegality indicate that it does not believe that the board's approval is required for the settlement agreement to be valid. Since the complaint does not allege that the board had any belief as to whether the settlement agreement required its approval or that the supposed lack of its formal approval materially affected the parties' exchange of performances, there was no mutual mistake here.

### 5.   *Knowing and Voluntary*

Federal common law applies a multifactor "totality of the circumstances" test to determine whether various federal law claims have been knowingly waived by the employee. *See, e.g.*, *Pierce*, 65 F.3d at 571; *Riley v. American Family Mut. Ins. Co.*, 881 F.2d 368, 372 (7th Cir. 1989). Under this approach, courts consider such factors as: (1) the employee's education and business experience, (2) the employee's input in negotiating the agreement's terms, (3) the agreement's clarity, (4) the amount of time the employee had for deliberation before signing, (5) whether the employee actually read the agreement and considered its terms before signing, (6) whether the employee received legal advice, and (7) whether the employee's acceptance was induced by improper employer conduct. *Pierce*, 65 F.3d at 571.

Here, the express terms of the settlement agreement establish that the second through seventh factors weigh in the board's favor—Washington negotiated the terms of the settlement agreement armed with the legal advice of an independent counsel of her choosing, the terms were clear and easy to understand, Washington could have taken twenty-one days to decide whether to sign the

agreement, she read and considered the terms with the help of her counsel, and the board did not interfere in this process. The only potential dispute would be over the first factor. Washington does not assert a mental incapacitation theory in her response brief, but she does make a passing reference to "a condition" in her complaint. [21] ¶ 41. She says that her agreement was not knowing or voluntary "because among other things, she was under medical care for a condition caused by Defendant's conduct," *id.*, but it is not clear that her condition had any effect on her mental capacity.

There is a presumption in Illinois that a person of a mature age is sane and has the mental capacity to contract. *Boswell Memorial Hosp. v. Bongiorno*, 314 Ill.App.3d 620, 622 (2d Dist. 2000). To the extent that Washington seeks to avoid the contract on a mental incapacity theory, she has the burden of proving such incapacity, *id.*, and because she does not elaborate on this allegation elsewhere in the complaint or in her brief, I conclude that Washington has not carried her burden of showing that she was mentally incapacitated at the time she signed the agreement. I also agree with the board's points that Washington has the education and business experience to understand the consequences of entering into the agreement. Additionally, the opportunity Washington had to seek the advice of her independent counsel, to think about the proposed agreement before executing it, and to revoke her consent up to seven days after execution, further increased her ability to appreciate the meaning of the agreement. I find that she was mentally competent when she signed the agreement. *In re Estate of Gruske*, 179 Ill.App.3d

675, 678 (3d Dist. 1989). The totality of the circumstances, as pleaded in the complaint and the attached settlement agreement, leads to the conclusion that Washington's consent was both knowing and voluntary.

### C. Consideration

"Consideration is defined as the bargained-for exchange of promises or performances, and may consist of a promise, an act or a forbearance," *Bishop v. We Care Hair Development Corp.*, 316 Ill.App.3d 1182, 1198 (1st Dist. 2000), and it is a required element for a valid contract, *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 329 (1977). If a party promises something as consideration that it is already obligated to do, the preexisting-duty rule provides that there is no consideration because the party will not suffer any detriment in fulfilling that promise. *Gavery v. McMahon & Elliott*, 283 Ill.App.3d 484, 489 (1st Dist. 1996). Courts assess whether consideration exists, but they do not inquire into the adequacy of consideration, so long as the signatory of the contract receives something of value in exchange for her own promise or detriment. *Baptist v. City of Kankakee*, 481 F.3d 485, 491 (7th Cir. 2007) (Illinois law).

Washington argues that the agreement is unenforceable because it is not supported by adequate consideration—the promises the board made in the agreement are invalid because the board already had an obligation to fulfill those promises under the preexisting-duty rule, or because providing those promises did not require the board to suffer a detriment. The board disagrees and points to paragraphs (a), (d), and (e) under the settlement agreement's heading "Board's

20

Consideration to Washington" as examples of the value Washington received in exchange for the settlement agreement. *See* [21] at 23–24.

The simplest way to resolve this dispute is to focus on the board's agreement to remove the CAP and any related documents from Washington's personnel file, and its agreement to not contest any unemployment compensation claim that Washington may file after June 30, 2017. *See* [21] at 24. That Washington objects to the existence of the CAP in her personnel file or the failure of the Human Resources Department to approve the CAP, *see* [25] at 7 (citing [21] ¶ 30), does not mean that the board had a legal duty to remove the CAP from her personnel file. Given Washington's interest in having the CAP removed, I conclude that the board's agreement to comply with her request constitutes valid consideration. Relatedly, Washington's opinion that the board would not have a basis to contest any unemployment claim she may raise in the future does not mean that it had a legal duty to abstain from contesting such a claim, should one arise. Washington would have been free to bring a claim after June 30, 2017, and the board would have been free to contest it; thus, the board's promise in advance to not contest such a claim is something of value to Washington. The necessary element of consideration is met here.

### D.    Formation Failure

Washington argues that the agreement is void because the Gale LSC did not consent to her removal from the principal position, and her principal contract required the Gale LSC to agree in writing before the contract could be terminated

by agreement of the parties. Washington does not cite any authority to support her argument. The board does not address this argument in its briefs.

The settlement agreement is not what caused Washington to be removed from her position as principal at Gale. The recitals make clear that "Washington ha[d] been removed from her principalship of Gale and reassigned to a Central Office position" before the parties executed the agreement. [21] at 23, 27. Even assuming Gale LSC's consent was a prerequisite to Washington's removal, the lack of that consent would be a defect in the transaction that preceded the settlement agreement, and my conclusion that the agreement is enforceable would mean that Washington released any claim she had concerning that failure in the previous transaction.[11]

### E.    Breach

Washington argues that she should be excused from performing her obligations under the agreement because the board breached essential terms of the agreement. When one party breaches a material provision of a contract, the other party is justified in not performing its obligations under that contract. *William Blair and Co., LLC v. FI Liquidation Corp.*, 358 Ill.App.3d 324, 346 (1st Dist. 2005). The determination of whether a breach is material "is a complicated question of

---

[11] The caption to this lawsuit states "Cassandra Washington on her own behalf, and on behalf of Local School Council for Stephen F. Gale Community Academy," but there is no legal authority to suggest that Washington may serve as a representative for that body. Washington was "a statutory member of the Gale LSC," [21] ¶ 13, presumably because she was its principal. 105 ILCS 5/34-2.1. But she offers no basis for her ability to bring a lawsuit on its behalf. Only the board's attorneys entered appearances for Gale LSC. *See* [9], [10]. Washington does not have the capacity to act for the LSC, and it is dismissed as a plaintiff from this action.

fact." *Id.* at 346–47 (quoting *Sahadi v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 706 F.2d 193, 196 (7th Cir. 1983)). The board breached the agreement, Washington argues, because it: (1) did not provide Washington a constitutionally-required opportunity to cross-examine witnesses at a hearing, (2) denied Washington her contractually-guaranteed salary increase, and (3) implicitly placed Washington in a negative light. The board does not respond to Washington's argument concerning breach.

The terms of the agreement do not provide that it is the board's obligation to provide Washington an opportunity to cross-examine witnesses at a hearing. Even assuming the board failed to do so, that failure is not a basis for arguing that the board breached the agreement. Second, the board agreed to pay Washington "the same pay and benefits that she received as the principal of Gale" from August 9, 2016 to December 9, 2016. [21] at 24. That obligation referred to Washington's salary in the past tense; it did not contemplate changing her salary going forward based on future board decisions or other market factors. When the board decided to award pay increases to principals after it had already signed the agreement with Washington, the agreement did not require the board to also increase Washington's pay. Thus, the board's failure to increase Washington's salary commensurate with the other principals is not a breach of the agreement. Finally, Washington's characterization of the board's public posting of resolutions related to her removal as "derogatory," [21] ¶ 95, without more facts about what language or facts she perceived as "derogatory," does not show that the board materially breached the

agreement. Although the board agreed to not put Washington in a negative light during the removal proceedings, the agreement contains an explicit caution that "some references to poor academic results and similar information shall be presented to legally justify an 8.3 principal removal." [21] at 23. The board did not materially breach the settlement agreement and Washington is not excused from performing her obligations under the same.

In sum, the settlement agreement is valid and enforceable; it is supported by consideration; it is not plagued by a formation failure; and because the board has not materially breached the agreement, Washington is not excused from performing her obligations under the agreement. Since the general release is effective, it follows that Washington released all claims she has against the board which arise out of or in connection with her employment and separation from employment with the board. Consequently, Washington released her claims as stated in Counts I through VI.

Washington has amended her complaint twice. Although leave to amend should be freely given, *see Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 518 (7th Cir. 2015), I decline to do so here. The parties' dispute over Washington's employment is covered by a valid and enforceable settlement agreement and release of claims. Any amendment to bring this dispute outside the scope of the agreement would be futile, and therefore, the complaint is dismissed with prejudice.

## IV.    Conclusion

The board's motion to dismiss, [22], is granted. The second amended complaint is dismissed with prejudice. Gale Local School Council is dismissed as a plaintiff from this case. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: January 24, 2018